NEWMARKET MANUFACTURING CO. *vs.* PENDERGAST *& a.*

A deed with the usual covenants of warranty from the party in possession of land, gives color of title, though the deed is not recorded.

Reference for description of the premises to a former conveyance, will control a statement of the quantity in a deed of land.

Thus, where a deed gave a general and incomplete description of the land conveyed, stated the quantity to be 126 acres, and that it was the same land which the grantor purchased of a certain third person, it was *held*, that all the land so conveyed to the grantor by the third person named, passed by the deed, though it amounted to 133 acres.

A man in possession of a tract of land conveyed it with a reservation in these terms : " The said grantor reserving to himself the privilege of the mills, and also all and singular the privileges annexed to the premises." There was once a mill on the land, but it was destroyed, and the part of the land where it stood had been occupied for other purposes twenty-five years, leaving nothing to show what land had been used with the mill ; *held*, that the reservation would not exempt from the operation of the deed any particular parcel of land as a mill yard or mill site ; that until some mill yard or mill site was entered on and assigned or set out, the deed would give the grantee right to enter generally into the land conveyed, and occupy the whole ; that an entry and occupation under the deed would be adverse to the claim of a distinct parcel of the land set up under a devise of the former will.

If a tenant in common, being in possession of the land, conveys it with a covenant of warranty against all claims and demands, possession under the deed will be adverse to the title of the other tenants in common.

In such a case, if the fact is found that the possession of the grantee is under his deed, it is a legal conclusion that his possession is adverse, and the question is not for the jury.

TRESPASS, for breaking and entering the plaintiffs' close in Durham ; described particularly in the declaration, bounded north by the centre of Lamprey river, extending back from the river about two hundred and six feet, and containing about one acre, lying southerly of Packer's Falls, on said river, and bounded on the west by the highway called Packer's Falls road.

Plea—the general issue. To show their title in the premises, the plaintiffs introduced the following deeds :

1. Deed with warranty, Roger Durgin to John Sullivan, dated April 30, 1771, acknowledged March 15, 1794, recorded March

24, 1794, conveying a tract of land estimated at 30 acres, described as adjoining Lamprey river on the north, and bounded by that river on the north, and including the plaintiffs' close.

2. Deed with warranty, Stephen Pendergast to John Sullivan, dated April 30, 1771, acknowledged and recorded January 22, 1793, conveying " one half of the mill privilege on the south side of Packer's Falls, with the same proportion of the dam, &c."

3. Deed with warranty, John Sullivan to Joseph Chesley, dated, acknowledged and recorded November 29, 1790, conveying " the land situated at Packer's Falls, which I purchased of Roger Durgin and John Shepherd, being in the whole about one hundred and twenty-six acres and nineteen rods, as planned and laid out by Andrew Torre, Esquire, bounded on the west by the highway, south by land belonging to Joseph Young and Samuel Joy, east by Lamprey River ;" said Sullivan, however, reserving to himself the privilege of the mills, and also all and singular the privileges annexed to the premises.

4. Deed with warranty, Joseph Chesley to Ebenezer Doe, dated and acknowledged April 11, 1809, recorded April 18, 1809, conveying one hundred acres of land, " all that I now own of the farm I purchased of Gen. John Sullivan, bounded northerly and easterly by Lamprey River," &c.

5. Deed of the same premises, Ebenezer Doe to Benjamin and Joshua Doe, dated April 18, 1809.

6. Deed, Benjamin Doe to William Wiggin, dated April 19, 1820, of one half the same premises.

7. Deed, Joshua Doe to William Wiggin, of one half the same premises, dated September 7, 1820.

8. Deed, William Wiggin to Seth S. Walker, dated July 9, 1823, conveying the plaintiffs' close by the same description that is used in the declaration.

9. Deed, Seth S. Walker to the plaintiffs, conveying the same premises by the same description, dated July 9, 1823.

It appeared that the *locus in quo* was on Lamprey river, opposite to Packer's Falls ; that a strip on the river, varying in width from two to four rods, was ledgy and incapable of cultiva-

tion; that previous to the time when Sullivan purchased of Durgin, there had been a saw mill on the premises near the Packer's Falls road, and on the south side of the river; that the saw mill was carried away by ice in the river about the year 1766, and no mill had been there since; that while the mill was in use, both sides of the Packer's Falls road were occupied by the logs and lumber; that there was a boom across the river above the mill, from which the logs were taken to be sawed. There was no other evidence to show what land was occupied with the mill; no evidence that any parcel of land was fenced out or otherwise assigned for a mill lot or mill yard, or used as such.

The plaintiffs' evidence went to shew that under Durgin, Sullivan, Chesley, the Does and Wiggin, the land in dispute was used and occupied with the rest of the farm, fenced in with a field which included other land, and that the part of the premises which was capable of cultivation was used as tillage or mowing without interruption. To this evidence there was no contradiction. The evidence as to the occupation since the purchase of the plaintiffs in 1823, was contradictory.

The plaintiffs proved that the defendants entered into the premises, passing over the part which had been used and cultivated as aforesaid, and blasted rocks on the ledgy part near the river, which was the trespass complained of.

The defendants claimed title by descent from Stephen Pendergast, and from Edmund and John Pendergast, his sons and devisees under his last will, and introduced the following deeds and instrument:

1. An extract from the records of the proprietors of Exeter, dated August 22, 1698, laying out 100 acres of land on Lamprey river to Peter Coffin, which tract appeared to include the premises. No evidence was offered to show that Peter Coffin owned any proprietary right.

2. Deed, Peter Coffin to Eliphalet Coffin, of the same land, dated Dec. 21, 1714.

3. Deed, Eliphalet Coffin to Stephen Pendergast, of part of the same land, including the premises, dated October 30, 1735.

4. The will of Stephen Pendergast, dated August 1, 1753, proved September 26, 1753, by which he devised to Stephen Pendergast, his son, a tract of land, including the land in question, and having on it the saw mill before mentioned, giving the line of the land devised on the river, running up the river side until it comes to the tree where it begun. In a subsequent part of the same will, Stephen Pendergast gives to his four sons, Stephen, Edmund, Solomon and John, one half of the saw mill, in these terms: " one half of my saw mill to my said sons, equally in quantity and quality," and further wills that his executors, who were his wife and his son Stephen, should sell one half the mill, with certain other property, and with the money pay his debts, and divide the remainder of the money, if any, among his children.

5. Deed, Stephen Pendergast to Roger Durgin, dated March 5, 1765, conveying fifty-nine and four fifths acres of land in Durham, bounded, beginning at a hemlock stump standing by a brook on the south side of Lamprey river, and runs south six degrees east ninety-seven rods to a road of two rods wide, joining on Samuel Joy's land ; then by said road to the main road, then on the other side of said main road the same course to Samuel Smith's land, thence by said Samuel Smith's land north twenty degrees east, one hundred and seventy-four rods, to Lamprey river, thence by said river west forty rods, then *on* south, seven degrees west, thirty-two rods, and from thence in a straight line to where it begun, with one half the saw mill and half the privilege of the same, *being the said land.*"

The defendants introduced evidence tending to show that, if the land described in S. Pendergast's deed to Durgin were surveyed out according to that description, the line laid down south seven degrees west, thirty-two rods, and the straight line thence to the first bound, owing to bends in the river would leave a portion of land between those lines and the river, and that the land in question would be excluded from the grant by those lines.

They also offered evidence that, if the land described in Sul-

livan's deed to Chesley were surveyed so as to include the land in question, the quantity would amount to one hundred and thirty-three acres instead of one hundred and twenty-six acres and nineteen rods, as given in the deed, and contended that the quantity must govern in this case, and control the other parts of the description.

There was evidence in the deposition of Eleazer Bennett, taken *in perpetuam*, that for a litttle time previous to the conveyance by Stephen Pendergast to Durgin, the saw mill was occupied in alternate weeks by Stephen Pendergast and the widow of his brother Edmund ; that after this conveyance till the mill was carried away, it was occupied by Durgin and the widow of Edmund Pendergast. There was evidence that other parts of the land conveyed by Eliphalet Coffin to Stephen Pendergast had been occupied by his descendants since his death.

A plan of the premises was made part of the case.

The defendants proved their descent respectively from John and Edmund Pendergast, sons of Stephen, and devisees in his will, and claimed undivided shares of the land in question by such descent, and contended—

That their evidence was sufficient to show the title and seizin of Stephen Pendergast, the devisor.

That Sullivan had no color of title to the premises, because his deed was not acknowledged and recorded during his occupation.

That Chesley had no color of title, because his deed did not convey the land in question, on account of the reservation of the privilege of the mill and the limitation of the quantity.

That the devise of the mills carried the mill lot and yard and the land used for the mill.

The court ruled that the evidence was competent to show the title and seizin of Stephen Pendergast, the devisor.

That by the devise of the mill, the mill yard and lot would pass if marked by distinct limits.

That Sullivan's deed, though not recorded, gave him color of title to the premises.

That the measurement of quantity in the deed of Sullivan to Chesley would not control the other parts of the description.

That the reservation in Sullivan's deed of the privilege of the mills would not exempt from the operation of the deed any particular parcel of land corresponding with or including the *locus in quo.* That until some mill yard or mill lot was entered on and assigned, or set out, the deed would give the grantee right to enter generally into the land conveyed, and occupy to the river; that this deed would give color of title to that extent; and an entry and occupation under this right would be adverse to the claim set up by the defendants.

A verdict was taken for the plaintiffs, by consent, subject to the opinion of the court on the foregoing case.

*Christie,* for the plaintiffs.

I. The deed of Durgin to Sullivan gave him color of title to the whole disputed premises, though not recorded. Durgin was, at least, tenant in common of the mill and mill privilege; his warranty deed will be presumed, at this distance of time, to have been rightly made; and possession under it, co-terminous with the deed, must be considered adverse to all other titles. *Lund* v. *Parker,* 3 N. H. Rep. 51; *Jackson* v. *Smith,* 13 Johns. Rep. 406. In this last case, the deed was not recorded until more than a year after suit brought. *Bailey* v. *Carlton,* 12 N. H. Rep. 1.

II. The case finds that from 1765 to 1823—fifty-eight years—from Durgin to Wiggin inclusive—the land in dispute was fenced in, occupied, and cultivated without interruption, by those from whom the plaintiffs claim. This is sufficient to quiet the title in the plaintiffs. *Boston* v. *Bulfinch,* 6 Mass. 229; *Fisher* v. *Prosser,* Cowp. 217; *Vandyck* v. *Van Buren,* 1 Caines 83.

III. The reservation in Sullivan's deed to Chesley, is void for uncertainty, and the whole premises pass by the grant. *Darling* v. *Crowell,* 6 N. H. Rep. 421; *Haven* v. *Cram,* 1 N. H. Rep. 93.

But if not void for uncertainty, it is a personal right, which

could not be exercised after the lapse of twenty years, and certainly not after the death of Sullivan. *Haven* v. *Cram*, 1 N. H. Rep. 93; *Jackson* v. *Van Buren*, 13 Johns. Rep. 525; *Vandenburgh* v. *Van Burgen*, 13 Johns. Rep. 212; *Thompson* v. *Gregory*, 4 Johns. 81; Shep. Touchstone 100; Co. Lit. 143, a, *et seq.*; Comyn's Dig., Reservation, B, 5.

IV. Chesley occupied to the river from 1790, and conveyed to Doe, bounding by the river; and this occupancy was continued, open, visible, undisputed, until 1823. This is sufficient, without color of title, to vest the estate. *Hale* v. *Glidden*, 10 N. H. Rep. 401; *Smith* v. *Hosmer*, 7 N. H. Rep. 436.

*Small, Richardson,* and *Emery,* for the defendant.

The mill is reserved in the devise of the land to Stephen Pendergast, jr., by his father. The mill was then standing, and the yard and premises used with the mill well known, and could have been easily ascertained by the parties. This reservation would include with the mill the land under it, and necessary for the use of it, and commonly used with it. *Whitney* v. *Olney*, 3 Mason Rep. 280; *Moore* v. *Fletcher*, 4 Shepl. Rep. 63; *Maddox* v. *Goddard*, 3 Shepl. 218; *New Ipswich Factory* v. *Batchelder*, 3 N. H. Rep. 190; *Gibson* v. *Brockway*, 8 N. H. Rep. 465; *Cocheco Manufacturing Co.* v. *Whittier*, 10 N. H. Rep. 305; *Jackson* v. *Vermilyea*, 6 Cowen 677; *Howard* v. *Wardworth*, 3 Greenl. Rep. 471.

It was not necessary that the mill yard and lot should be marked by distinct limits.

The deed from Stephen Pendergast, jr., to Durgin, excludes the mill and mill yard, and such was the intention of the parties. No usage or possession can be introduced to control the clear words of the deed. *Allen* v. *Kingsbury*, 16 Pick. 235.

Between the line given in that deed and the river, is a strip of land—the *locus in quo*—and, as the defendants contend, the mill yard.

Sullivan, by his conveyances from Durgin, did not get a title to the whole mill. He only got the title of Stephen Pendergast, jr.,

which would be one fourth of one half, and his right as heir to his father in the other half. This would make Sullivan tenant in common, and his possession would not be adverse. Sullivan had no actual possession of the mill privilege and lot, and his deeds cannot extend his possession, because they were not acknowledged and recorded till 1794. *Little* v. *McGuire*, 2 Greenl. Rep. 176 ; *Kennebeck Pur.* v. *Labaree*, 2 Greenl. 275 ; *Pomroy* v. *Stevens*, 11 Met. 444.

If Sullivan had title, his deed to Chesley does not embrace the premises on account of the reservation in his deed. It is called a reservation, but is in legal operation an exception. It does not include the land, because the quantity limited would not convey the premises to the *locus in quo.*

The entry and occupation by Chesley, under his deed, would not necessarily be adverse. It should have been left to the jury as matter of fact. *Bailey* v. *Carleton*, 12 N. H. Rep. 16 ; *Kimball* v. *Dogget*, 2 Fairfield Rep. 315.

PERLEY, J. Did the deed of Durgin to Sullivan give color of title to the land in question ? That deed, in the plainest terms, conveyed the land ; the description bounding the premises on the north by the river. Durgin had fenced in the land with the rest of his field, and had all of it under cultivation that was capable of it. He was then in possession, and conveyed the land by a clear and unequivocal description, with covenants of warranty. The deed was operative between the parties without registration or acknowledgement. Sullivan's right to enter and occupy did not at all depend on the registration of his deed. Registration was only necessary to defend the grantee against a subsequent title derived from the same grantor ; and these defendants do not claim under Durgin, nor even under Stephen Pendergast, jr., but under two of his brothers. This is not a mere release from one who had no title or possession. It is a deed with warranty from the party who was in actual possession and control of the premises. It would be difficult to state a case where a deed would give a color of title, if this deed did not. *Tyler* v. *Hammond*, 11 Pick. Rep. 193.

The point taken on trial, and on which the court of common pleas ruled, was, whether the deed of Durgin gave Sullivan color of title.   Another position is taken here, which was not taken on trial, and on which the court were not then called on to give an opinion.   The ground now taken is, that the deed of Durgin could not extend the legal beyond the actual possession taken under it, because it was not recorded.   This point was probably not omitted to be taken through any inadvertence of counsel, for it does not appear to arise on the facts stated in the case. The case finds that Durgin, Sullivan and Chesley, during the respective periods of their occupation, had the whole land fenced in to the river, and the largest part, and all that was capable of it, under cultivation.   There could be no entry into the land without an actual breach of the enclosure which the occupants had established around it.   This was an actual possession, and the doctrine of constructive possession has no application to the facts of the case.   Angell on Limitation, 423.   A possession may be actual and yet not adverse ; but there was no question of adverse possession on this part of the case.   Then again, the land in dispute extended back from the river about twelve rods ;  the ledgy part varied in width, from two to four rods ;  and the case finds that the entry of the defendants was upon and across the cultivated part ; so that this trespass was committed, certainly in part, on land not only enclosed, but actually cultivated by Durgin, Sullivan and Chesley.   It is not necessary, therefore, to decide the question whether an unrecorded deed will extend the possession taken under it to the limits of the land described, because the case does not raise that point.

We wish, however, to guard against the inference that we acquiesce in the position of the defendants.   In Massachusetts and Maine, the doctrine of constructive possession under a deed which gives color of title, would seem to have been limited to cases where the deed was recorded.   No such qualification of the doctrine appears to have been admitted elsewhere, and this limitation of the principle has not been recognized hitherto in this State.   Our cases put the doctrine upon a ground which does

not appear to require that the deed should be recorded; for in this State an entry and possession under a deed which gives color of title, is not sufficient to give possession by construction, as against the true owner, unless the possession be so notorious as to give presumptive notice of the title under which it is taken, such as would necessarily imply an acquiescence of the true owner in the claim, and supersede the necessity of registration. *Bailey* v. *Carleton*, 12 N. H. Rep. 16.

Registration of the deed has been held necessary to give constructive possession under it, upon the ground that registration gave notoriety to the claim. But for other purposes, the registration of a deed has not been held to give public notoriety to the title claimed under it. It is not, in law, notice to any party except those who claim under the same grantor, and we do not find it easy to perceive the distinction upon which it is presumed to be notice in this case, of constructive possession. *Tilton* v. *Hunter*, 11 Shepley Rep. 29.

It is contended that the deed of Sullivan to Chesley gave no color of title ; first, because the reservation in that deed excluded the *locus in quo* from the description of the premises ; and secondly, because the statement of the quantity of land conveyed would control the other parts of the description, and leave the land in question without the limits of the grant.

The premises in that deed are described thus : " The land situated at Packer's Falls, which I purchased of Roger Durgin and John Shepherd, being in the whole one hundred and twenty-six acres and nineteen rods, as planned and laid out by Andrew Torre, Esquire, bounded on the west by the highway, south by land belonging to Joseph Young and Samuel Joy, east by Lamprey river."

The survey of Torre is not in the case, and cannot aid the construction of the deed. In the first place, there is nothing in the case, nor in the plan which is made part of the case, which shows how the one hundred and twenty-six acres and nineteen rods are to be measured off. If the quantity was taken off by a line parallel to any one of the lines of the tract as laid down in the plan, it is

quite manifest that the one hundred and twenty-six acres and nineteen rods would include the land in dispute, and leave out land to which it is not pretended that the defendants have any claim. The southerly line upon land of Young and Joy, is laid down in a course south, seventy-nine degrees east. A glance at the plan will show that the quantity named in the deed taken off on that line would include the land in question; and so of the west line. There is nothing, therefore, in the limitation of quantity alone, that would aid the defendants, even if they were correct in their position that this part of the description controlled the rest.

The whole land sold to Chesley is not laid down on the plan, and it does not appear from that, nor otherwise, how it could reach to Lamprey river on the east, according to the description in the deed, and the land is said to be at Packer's Falls; but the land in dispute is at and on Packer's Falls, and if that were excluded from the premises conveyed, they would not be at Packer's Falls in any usual and proper sense of the term, but full twelve rods distant from them.

The land conveyed is described as the land which Sullivan bought of Durgin and Shepherd. Following this part of the description, it would, of course, include all the land that Sullivan bought of Durgin and Shepherd; and this reference to the purchase from Durgin would alone control the statement of quantity in the deed. *Jackson* v. *Barringer*, 15 Johns. Rep. 472; *Doe* v. *Ashley*, 10 Adol. and Ellis, (N. S.) 663.

The variation is hardly more between the quantity stated in the deed, and the recent measurement by the defendants, than we should expect to find, and than is usually found, from surveys like this, over sixty years old. If this quantity were to be measured off, or had been measured off, so as to exclude the land in dispute, why should Chesley enter into the whole tract? He entered into the whole, and held without question from any quarter, for thirty-three years; and this is a practical construction of the deed by the parties, which would aid us, in a case of this kind, to discover their meaning, if aid of that sort were needed.

The reservation or exception in Sullivan's deed to Chesley is in these terms : " Said Sullivan, however, reserves to himself *the privilege of the mills, and also all and singular the privileges annexed to the premises.*" The defendants claim under the' devise of a mill made in 1753. The mill was destroyed in 1766, and no mill has been there since. Durgin before 1771, and Sullivan from that time to his conveyance in 1791, occupied the land claimed by the defendants, not for a mill or mill yard, or as a mill privilege, but included it in a cultivated field, and actually cultivated the largest part of it and all that was capable of cultivation. This entirely excludes all idea that at the time of the conveyance in 1791, there was any thing on the ground to mark the limits of any former mill yard or mill lot, or to indicate what land had once been used and occupied with the mill. The mill had been gone for twenty-six years, and the land during all that time had been used and occupied for other purposes. There was nothing in existence at the time of the conveyance to which the reservation or exception could refer as a parcel of land with boundaries ascertained or capable of being ascertained with reasonable certainty.

Sullivan had an unquestionable title to an undivided share of any land that was devised by the will of Stephen Pendergast, senior, under his deed from Stephen Pendergast, jr., and the exception, if it related to that land, would exclude from the operation of the deed his own share in it. Yet Sullivan upon the execution of the deed surrendered up this land to Chesley, who entered and occupied as he did the rest, and as his own, for thirty-three years, till he sold it. This is a practical construction which the parties themselves put upon the deed, and that construction after long acquiescence the court will adopt when the language of the deed is ambiguous. *Sprague* v. *Seymour,* 15 Johns. Rep. 474 ; *Choate* v. *Burnham,* 7 Pick. 274.

If the intention were to except the land formerly occupied with the old mill, why was not that intention plainly, or at least intelligibly, expressed ? Not the most distant allusion is made to it, nor a word used to give the slightest suspicion that it was at

all in the minds of the parties. The language employed is quite inconsistent with an intention to except a parcel of land once used with the mill. The thing excepted is " the privilege of the mills ;" whereas there was but a single mill devised, and no other mill appears ever to have been on the premises. Taken in its most common and obvious sense, the language used would be taken to relate to some right of flowage, or some right to maintain a dam for the use of mills on the stream that belonged to Sullivan or to others ; and one fact appears in the case, which adds to the probability that this was the actual meaning of the exception ; for we find that several years after the old mill was destroyed, a dam abutted on the land ; and we may well suppose that there might be mills supplied with water from the dam, and that the dam flowed the water upon the land conveyed. In that case the reservation would obviously be intended to except from the conveyance and the warranty this right appurtenant to the mills.

It is not a mill yard, nor yet a mill privilege that is reserved, but it is the " privilege of the mills," which would be understood to mean some known privilege belonging to some existing mills, and can hardly be tortured into a construction which would include a parcel of land which had been used with a mill that had been destroyed and abandoned for twenty-five years, and no means left of ascertaining what land was used with the mill.

After making this reservation, the deed proceeds as follows : " and also all and singular the privileges annexed to the premises." These other privileges, reserved in the same form, are annexed to the premises. The privileges were apparently all of the same general nature, and annexed to the premises, not excepted out of them.

We are quite clear, looking to the language of the deed, the situation of the premises at the time, and the subsequent conduct of the parties, that this exception or reservation cannot be construed to refer to the land which was once used with the mill.

If by the " privilege of the mills" we could understand that the deed meant the mill privileges on the land, and the right of erecting mills at suitable places, and the right to take land necessary

for that purpose, still, until land for the mills were assigned, or entered upon and set out, Chesley would have the right which he exercised, of entering generally into the land and holding the whole of it under his deed. *Stukely* v. *Butler*, Hobart 174 ; *Vanderburg* v. *Van Bergen*, 13 Johns. Rep. 212 ; *Jackson* v. *Van Buren*, 13 Johns. Rep. 525 ; *Jackson* v. *Vermilyea*, 6 Cowen 677.

It is observable that the two separate grounds taken by the defendants against the operation of Sullivan's deed upon the land in dispute, instead of aiding each other are quite inconsistent. For if the description did not extend north to the river and include the land, then it would not be excepted out of the premises before described ; and on the other hand, if the land was excepted out of the description, it was of course covered by it.

The court ruled that an entry and occupation under the deed of Sullivan to Chesley would be adverse to the claim set up by the defendants.

The claim of the defendants is, that by the devise of a mill in the will of Stephen Pendergast, a tract of land passed corresponding with or including the *locus in quo ;* that they are tenants in common with others of this tract of land. They do not claim a privilege or unascertained right in the land, but they claim that they and their co-tenants have the sole and exclusive title. The deed recognises no such title, but conveys the land with warranty, and undertakes to give the grantee the right to enter and hold the whole, at least until the privilege reserved should be ascertained and defined ; and an entry and occupation under the deed would of course be an assertion of the right to hold and occupy the whole land against any such claim as the defendants set up. If the possession under the deed were not adverse to the defendants title, it should be subordinate to it. But the titles under which the parties claim are certainly inconsistent with each other, and of course adverse. No argument or illustration could make the point plainer.

If Sullivan was, as the defendants contend, tenant in common of the land, it would not at all affect this question ; for if the

entry and occupation were under the deed, the character of the possession would depend on the deed alone and not on the title of the grantor.   If it were a quitclaim deed or mere release, the effect might be different.   *Kittredge* v. *The Locks and Canals*, 17 Pick. 246 ; *Parker* v. *The Locks and Canals*, 3 Met. 91.

But it is said that whether the possession was adverse, was a question of fact, which should have been left to the jury.   Where it is a disputed fact in the evidence whether a possession is under the title of the true owner or adverse to it, it must, undoubtedly, like other questions of fact, be settled by the jury.   In this case, if it had been a question upon conflicting evidence whether Chesley entered and held under his deed, and claimed the whole land according to the deed, or admitted the title of the defendants and held subject to it, that fact must have been found by the jury ; but if it were conceded that Chesley entered and held under his deed, which gave him an absolute title to the whole land as against the claim of the defendants, there was no fact to be found necessary to constitute his possession as adverse ; it was manifestly a mere legal conclusion.   *Kittredge* v. *The Locks and Canals*, and *Parker* v. *the same, qua supra.*

The defendants maintained that the boundaries given in the deed of Stephen Pendergast, the son, to Durgin, excluded the land in dispute, and that the land so left out of that deed, upon the river, was the mill yard and lot.   It is to be observed that the defendants do not claim under Stephen Pendergast, the son, and there was no question as to the character of Durgin's possession ; and it is not easy to see how this fact would be material, if it were found as the defendants contend.

But it is quite plain by reference to the plan, that the land left between the straight line running to the last monument in that deed and the river, if any were intended to be left, would not correspond with, if it included, any tract of land assigned for, or used as a mill yard ; it would leave an irregular tract, extending along the river far to the west of any land that could have been used for the purpose of the mill.   It would be practi-

cally impossible, at this distance of time, after more than eighty years occupation and cultivation, without any regard to the line now attempted to be set up, by reference to such a description in a deed, to ascertain with any reasonable degree of certainty where the land was. Besides, it is apparent from the manner in which the line is laid down on the plan, that the measurements have been made on a mistaken construction of the deed; for in order to exclude the land in dispute from the description in that deed, the defendants, in measuring the line, which is carried in the description to the river, stop on the south bank; whereas the legal construction carries that line to the centre of the stream. The width of the river is not given in the case; but if the defendants had measured the line to its legal termination at the centre of the stream, then measured from that point the thirty two rods on the given course, and thence struck their straight line to the last monument, it would have certainly left less, and might have left nothing of the *locus in quo*. The tract which by legal construction was devised under the description of the mill, could never have corresponded with the land which the defendants now measure off as left between the river and Durgin's grant.

It is objected that the construction put upon the devise of the mill in Stephen Pendergast's will was incorrect, because it was ruled that the mill yard and lot would pass if marked by distinct limits; whereas the land actually used with the mill, or necessary to its use, would pass by that description, though not marked by distinct limits.

It is not necessary that the land used with the mill should be enclosed with fences or marked out on the ground in any particular manner, in order to pass under the devise of the mill. Yet in a case like this, the party who sets up title to land must be able to shew the bounds and limits of it, otherwise he cannot prove where his land is, and of course cannot justify his entry under his title. But whether the court stated the rule of construction with technical correctness or not, was wholly immaterial to this case; for under the other rulings of the court,

the defendants have had the full benefit of the devise on the most favorable construction that they can claim. Whether their evidence tended to show a mill yard or lot marked by distinct bounds, or a general use of land connected with the mill, not marked by distinct limits, but from which the jury might infer that the land in dispute passed under the devise, the defence wholly fails. All the rulings of the court, and the whole trial proceeded on the ground that the land in dispute did pass by the devise. There is no reason for disturbing the verdict on this point.

*Judgment on the verdict.*